IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| United States of America, | Case No. 3:06 CR 495 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| James E. Lutz, | |
| Defendant. | |

### INTRODUCTION

This matter is before the Court on the Motion of Defendant Lutz to Vacate (Doc. No. 21) pursuant to 28 U.S.C. § 2255, and the Government's Response (Doc. No. 28). This Court subsequently granted Defendant's Motion to Supplement (Doc. No. 33) his Section 2255 Motion. This Court then issued an Order (Doc. No. 38) requesting both parties file supplemental briefs in light of *United States v. Bruce*, 531 F. Supp. 2d 983 (N.D. Ill. 2008). As requested, both parties filed supplemental briefing (Doc. Nos. 39-42).

### FACTS

Defendant waived indictment and pled guilty (Doc. No. 6) to a single-count Information (Doc. No. 1) which alleged that over a period of two years, Defendant stole some $150,000 from Wal-Mart in the following manner. Defendant used a bar code generator to create false Universal Product Code ("UPC") labels that he placed on merchandise in a Wal-Mart store. These labels reflected a far lower price for the goods than the real UPC label. Defendant then purchased the particular goods at the

lower price, took the goods home where he removed the fake sticker, and then returned the goods back to the store to receive a gift card for the higher (actual) price of the goods. Then, with the gift card, Defendant would purchase other merchandise which he would take home and later return to the store, this time purchasing merchandise priced slightly more than the returned merchandise, requiring him to spend a little cash to make up the difference. This allowed him to receive a new receipt that matched the last purchase (gift card plus cash), but that receipt would simply appear as a cash purchase, enabling him to then return to the store with that receipt and the merchandise and obtain cash for the full amount.

The statute under which Defendant was charged states in relevant part that it applies to anyone who "knowingly and with intent to defraud, produces, uses, or traffics in one or more counterfeit access devices." 18 U.S.C. § 1029(a)(1). An access device is:

> [A]ny card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other **means of account access** that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029(e)(1) (emphasis added). A counterfeit access device is "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." 18 U.S.C. § 1029(e)(2). The parties agree a UPC qualifies as a "code."

In his various motions, Defendant challenges the sufficiency of the Information,[1] which this Court interprets as whether his offense is chargeable under 18 U.S.C. § 1029. This argument rests upon the theory that his use of UPC labels is not an access device under the statute because he did not access an identifiable account and, therefore, the Government cannot charge (or convict) him under the statute.

## PROCEDURAL CHALLENGE

The Court will first address whether Defendant's Motion under Section 2255 to vacate his sentence is an appropriate vehicle for challenging his confinement.

Generally, claims that could have been raised in a direct appeal, but were not, are barred from further review. *Ratliff v. United States*, 999 F.2d 1023, 1025 (6th Cir. 1993). However, Defendant may raise claims not presented on direct appeal in a Section 2255 motion if "(1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (*citing Bousley v. United States*, 523 U.S. 614, 622 (1998)). To show actual innocence, Defendant must prove "a fundamental defect which inherently results in a complete miscarriage of justice or an error so egregious that it amounts to a violation of due process." *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*citing Hill v. United States*, 368 U.S. 424, 428 (1968)). "The proper 'fundamental

---

[1] The standard for judging the sufficiency of a bill of information is the same as for judging the sufficiency of an indictment. *See United States v. Cato*, No. 91-5710, 1992 WL 51475 at *2 (6th Cir. Mar. 18, 1992). To be sufficient, an indictment must contain the elements of the offense charged and fairly inform a defendant of the charges against which he must defend. *Allen v. United States*, 867 F.2d 969, 971 (6th Cir. 1989). The Bill of Information in the instant case alleged that "James Lutz . . . did knowingly and with intent to defraud the Wal-Mart Company, use more than one counterfeit access device . . . Universal Product Code labels . . . in violation of Title 18, United States Code, Section 1029(a)(1)" (Doc. No. 1). The Information sufficiently identifies the elements of the offense charged and the charge against which Lutz had to defend himself. Accordingly, the Information is valid on its face.

3

defect' inquiry asks whether the 'defendant stands convicted of an act that the law does not make criminal.'" *Logan v. United States*, 434 F.3d 503, 509 (6th Cir. 2006) (*citing Bousley*, 523 U.S. at 620). Defendant must assert actual innocence of the crime based on the facts of the case, not legal innocence based on procedural errors of the trial court.

If Defendant is actually innocent of the charged federal crime because he did not access an account as required by the statute, then clearly there would be "a complete miscarriage of justice." Following the Sixth Circuit's holding in *Regalado*, Defendant argues he pled guilty to a crime based on actions that do not support a conviction under Section 1029 and is therefore actually innocent.

### APPLICATION OF THE STATUTE

The specific issue before this Court is what qualifies as an "account" under Section 1029. That term is not defined in the statute. The Sixth Circuit has not yet decided whether a UPC label can be considered an access device under Section 1029. Indeed, the question has only recently been considered by other courts. *See United States v. Bruce*, 531 F. Supp. 2d 983 (N.D. Ill. 2008). In the instant case, there are two possible moments when it can be argued Defendant accessed an account: (1) whether Lutz accessed an account in the form of Wal-Mart's general cash register sales receipts at the moment he used the counterfeit UPCs to obtain goods below value; and (2) whether an account relationship was created between Wal-Mart and Lutz upon the issuance of a gift card. Each action will be examined in the context of Section 1029.

4

#### DEFINITION OF ACCOUNT

**Cash Register Sales**

The United States District Court for the Northern District of Illinois recently held that an account under Section 1029(e)(1) must be both (1) a formal record of debits and credits, and (2) based upon an ongoing contractual relationship. *Bruce*, 531 F. Supp. 2d at 989.

The facts in *Bruce* are similar to those presently before this Court. The defendant in *Bruce* made counterfeit UPC stickers and used the counterfeit stickers to obtain merchandise from a local Wal-Mart at vastly cheaper prices. However, *Bruce* does not indicate whether the defendant there returned the goods for the actual retail price, or whether a gift card was received as part of the scheme.

In *Bruce*, the Government argued the "account" which defendant accessed for purposes of Section 1029(e)(1) was Wal-Mart's formal internal accounting system which records the store's credits and debits. Defendant argued the internal accounting system did not amount to an "account," but rather constituted a mere ledger system.

The *Bruce* court relied principally on the fact that no ongoing contractual relationship exists between a store and its walk-in customers who pay for goods at the register. *Id.* at 989. The court further found that a cash register did not amount to a "valid identifiable account of the retailer's customers," but instead was just a statement of income and inventory. *Id.* Coupling these two factors, the court held that a UPC did not qualify as an access device under the statute and dismissed the case. (The Government chose not to appeal.)

The only guidance to be found in the Sixth Circuit on the definition of "account" comes from *United States v. Ashe*, 47 F.3d 770 (6th Cir. 1995), a case which dealt with a defendant charged with

5

trafficking in altered cellular telephones capable of illegally obtaining roaming cellular telephone services by using a telephone tumbler. The altered cell phones did not tap into a **customer** account. Rather, the altered phones accessed accounts held **between carriers**. Roaming cell phone calls are carried by the foreign carrier who is later reimbursed by the home carrier,[2] who passes the charge on to its customer. In *Ashe*, the altered cell phones provided the foreign carrier with a valid home carrier identification number, but the home carrier could not then trace the call because the account number was fictitious. Thus, the home carrier was left holding the bag and absorbing the charges.

The Sixth Circuit held that the Government need not show an identifiable customer account to support a charge under Section 1029. *Ashe*, 47 F.3d at 774. Because of "preexisting agreements and practices within the inter-telephone carrier network," using invalid identification numbers affects the accounts between carriers. *Id.* The Sixth Circuit emphasized that the tumblers illegally intervened in a legitimate account relationship between the two carriers.

Thus, courts interpret Section 1029 as requiring access to a system that monitors or tracks an ongoing account relationship between two parties. For example, in *United States v. Jackson*, 484 F. Supp. 2d 572 (W.D. Tex. 2006), the defendant stole non-revenue airline tickets, which included an airline code and unique ten-digit ticket number, and then sold the tickets to friends and fellow co-workers. The district court held the tickets did not access an account as required by Section 1029. In coming to this conclusion, the court focused on the fact that the Government only identified a

---

[2] A telephone tumbler creates a false identification for cellular phones, allowing a caller to use the service for free.

"Foreign carrier" refers to a service provider with whom the caller does not have an account.

"Home carrier" refers to the service provider with whom the caller does have an account, or in this instance, ostensibly has an account.

ledger system used to track passes that are issued and later redeemed. Opining on the distinction between "account" and "ledger," the *Jackson* court noted that a ledger system is "simply an internal tracking process," not unlike an inventory account, and because the vouchers never accessed an account, "no credit relationship existed between the airline and the recipient of the pass." *Id.* at 576.

Here, Wal-Mart's cash register system is an internal ledger that tracks payments made, and goods sold, for inventory purposes. The cash register transactions do not represent an ongoing relationship between Wal-Mart and its customers. Further, the UPCs do not access an account between Wal-Mart and another party, such as one of its vendors. Rather, the UPCs simply access Wal-Mart's internal auditing system. Therefore, Defendant did not access an "account" within the meaning of Section 1029 when the counterfeit UPCs were scanned at the register.

Defining "account" to include such a general ledger system would "turn § 1029 into a general theft statute applicable whenever a company can document a loss through fraud." *United States v. Brady*, 13 F.3d 334, 340 (10th Cir. 1993). For example, the practice of switching tags on products or thwarting a store's electronic theft tags by use of magnets or some other disabling device would come within the purview of Section 1029. This conduct does not meet either the purpose or purview of the statute, although clearly illegal under state laws.

**Use of Gift Cards**

The next issue is whether Defendant illegally accessed an "account" under Section 1029 when he returned the merchandise, now with the original UPC code, and obtained gift cards with inflated values.

In *United States v. Abozid*, 257 F.3d 191 (2d Cir. 2001), the Second Circuit held that an account existed under Section 1029 when a travel agent created a large number of valid airline tickets

7

and subsequently failed to reimburse the airlines.  The travel agent was accredited by the Airline Reporting Corporation ("ARC"), which afforded the agent a unique number that enabled him to obtain airline tickets on credit.  The Second Circuit described the arrangement as one where "[e]ach agency has a credit relationship with the airlines under which the agency opens a bank account to which ARC has access.  The agency is required to deposit into this account cash (less commission) received from customers for tickets." *Id.* at 193-94.  Additionally, each agency was required to provide collateral to ARC to cover any potential deficiencies in the account, and airlines issued monthly statements to agents stating how much the agent owed them.  *Id.*  In holding that an account relationship existed, the court focused on the fact that there was an ongoing credit relationship between the agent and the airlines.

This case involves the use of a gift card to obtain a "transfer of funds."  A gift card reflects a merchandise credit issued to a cardholder who may use it in the future or freely transfer the card to another for their personal use.  Does it create a give-and-take credit relationship (an account) between parties as contemplated by the statute?  To help answer this question, we look to the statute and its history.

**Congressional Intent**

The Court looks to the legislative history of Section 1029 for guidance.  In 1984, Congress enacted the Credit Card Fraud Act because of concerns about unauthorized use of account numbers or access codes to gain access to bank or credit accounts.  *See* H.R. Rep. 98-894, 98th Cong., 2d Sess. (1984). As technology expanded, Congress used a broad definition of "access device" to include other means of accessing personal accounts.  In 1994, the law was amended, in a bill largely addressing wiretapping, to include the use of cloned cellular telephones as a means of getting free

8

service while charging the usage to another customer's account. *See* H.R. Rep. 103-827(I), 103d Cong., 2d Sess. (1994). The amended language of Section 1029 was largely in response to the Tenth Circuit's decision in *United States v. Brady*, 13 F.3d 334 (10th Cir. 1993), in which the court held that former Section 1029 did not cover cellular phone "tumblers." Consequently, Congress expanded the scope of access device to adapt to technological changes, and the Government used this expansion to prosecute the use of cellular phone tumblers as well.

The original purpose of the statute was to protect credit- and debit-based accounts from being illegally accessed. Congress has not expanded this purpose, although courts have continued to define "access device" broadly. However, the definition of "account" remains essentially the same: namely, "a detailed statement of the debits and credits between parties to a contract or to a fiduciary relationship." Black's Law Dictionary (8th ed. 2004).

The Sixth Circuit in *Ashe* refused to limit Section 1029 to identifiable customer accounts, but the court still required some identifiable account between persons or businesses exemplifying an ongoing relationship. The congressional intent behind the statute requires the unlawful device to access an identifiable account to commit the theft. Here, Lutz's use of UPC labels did not access such an account -- neither through the creation of a fraudulent gift card, nor through a preexisting account between Wal-Mart and another party. At most, the gift card may have created -- not accessed -- a fraudulent account between Lutz and Wal-Mart.

The Government argues the use of UPC labels to steal money involved "sophisticated equipment and planning to recreate the specific retailer's bar codes, plus knowledge of which bar codes to alter, to cause a reduced sale price to ring on the cash registers." The Court agrees, but sophistication does not mean the Court can go beyond the textual limitations of the statute and create

a federal crime out of a simple, albeit technologically clever, theft. Lutz's actions are still criminal and subject to state theft laws but do not equate to a violation of this federal statute.

## CONCLUSION

Defendant's fraudulent UPC label scheme involving both cash transactions and gift card redemptions, did not access an account, a necessary predicate for violation of Section 1029(a)(1). No matter how the Court characterizes the scheme, it simply does not fit a plain reading of the statute. The limited case law and congressional history further support this conclusion. Therefore, the Court grants the Motion to Vacate Sentence.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 30, 2008